Richard C. Miller, F0458
BANES HOREY BERMAN & MILLER, LLC
Suite 201, Marianas Business Plaza
P.O. Box 501969
Saipan, MP 96950
Tel.: (670) 234-5684
Fax: (670) 234-5683
Email: RMiller@pacificlawyers.law

*Attorneys for Plaintiffs*

FILED
Clerk
District Court

NOV 20 2020

for the Northern Mariana Islands
By _____
(Deputy Clerk)

IN THE DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| ÖZCAN GENÇ, HASAN GÖKÇE, and SÜLEYMAN KÖŞ, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC, IMPERIAL PACIFIC INTERNATIONAL HOLDINGS LTD., and IDS DEVELOPMENT MANAGEMENT & CONSULTANCY,<br><br>Defendants. | CIVIL CASE NO. 20-00031<br><br>COMPLAINT AND JURY DEMAND |

## INTRODUCTION

Plaintiffs Özcan Genç, Hasan Gökçe, and Süleyman Köş, on behalf of themselves and all other similarly situated H2-B workers recruited from Turkey (collectively "Plaintiffs"), file this collective action complaint under the federal Fair Labor Standards Act ("FLSA") against Defendants Imperial Pacific International (CNMI), LLC, Imperial Pacific International Holdings Ltd. (collectively "IPI"), and IDS Development Management & Consultancy ("IDS")

(collectively "Defendants"), to recover unpaid minimum wage and overtime compensation and other damages, as well as FLSA retaliation claims and breach of contract claims.

Defendants recruited master plumbers, carpenters, electricians, and other construction workers and foremen from Turkey in 2019 to help build the Imperial Palace hotel in Garapan. Defendants made promises to induce them to come to Saipan and work at wages not much above the minimum wage – substantial overtime hours, roundtrip airfare to Turkey if they renewed their initial six-month contract, a Turkish cook to prepare meals for them, among other promises. Overtime hours disappeared after a few months, the airfare and the Turkish cook never materialized. Then, in June, IPI started missing the biweekly paydays. Twice, Plaintiffs have gone more than a month without any cash in their pockets. Drinking water and internet service have been cut off to them at their barracks. Conditions have deteriorated to the point that Plaintiffs have no choice but to seek relief due them under American law.

## JURISDICTION

1. The Court has jurisdiction over the FLSA claims under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b). The Court has supplemental jurisdiction over the breach of contract claims under 28 U.S.C. § 1367(a).

2. Venue is proper in the District for the Northern Mariana Islands pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

3. Plaintiffs are citizens of Turkey and are or were, at all relevant times, employees of IPI admitted to the United States under the H-2B temporary non-agricultural worker program administered in part by the U.S. Department of Labor ("DOL") as construction workers to build

the Imperial Palace hotel in Garapan, Saipan, Commonwealth of the Northern Mariana Islands ("CNMI").

4. Plaintiffs and all other similarly situated persons are or were, at all relevant times, non-exempt covered employees within the meaning of the FLSA, 29 U.S.C. § 203(e)(1).

5. Plaintiff Özcan Genç ("Özcan") started working for IPI in January 2020. He is a foreman and the leader of the welding and drywall team. Özcan's title on IPI's Certificate of Employment is Construction Carpenter, and his salary is stated therein as $21,840.00 a year.

6. Plaintiff Hasan Gökçe ("Hasan") started working for IPI in January 2020. He is a plumber and a master of pipe installation, and a plumbing foreman. Hasan's title on IPI's Certificate of Employment is Plumber, and his salary is stated therein as $21,840.00 a year.

7. Plaintiff Süleyman Köş ("Suleyman") started working for IPI in January 2020. He is an electrician and was promoted to electrical foreman in June 2020. Suleyman's title on IPI's Certificate of Employment is Electrician, and his salary is stated therein as $17,368.00 a year. However, since his promotion to foreman, his base wage rate increased to $10.50 an hour, which annualizes to a full-time salary of $21,840.00.

8. Twenty-eight Turkish workers, including the three named Plaintiffs, have signed consents to join this FLSA collective action under 29 U.S.C. § 216(b).

9. Defendant Imperial Pacific International (CNMI), LLC, is and at all relevant times was a CNMI limited liability company that operates a resort hotel and casino. It is a subsidiary of Imperial Pacific International Holdings, Ltd., and has an office and place of business in Saipan, CNMI.

10. Defendant Imperial Pacific International Holdings, Ltd., is and at all relevant times was an investment holding company based in Hong Kong and listed on the Hong Kong Stock Exchange. It has an office and place of business in Saipan, CNMI.

11. Defendant IDS Development Management & Consultancy is and at all relevant times was a company registered in Turkey, Saudi Arabia, and the United Arab Emirates. IDS recruits workers in Turkey and the Middle East and manages them at construction projects worldwide. At all relevant times it had representatives at the Imperial Palace construction site in Saipan, CNMI.

12. Imperial Pacific International (CNMI), LLC, and Imperial Pacific International Holdings, Ltd. (collectively "IPI"), are, and at all relevant times were, an employer within the meaning of the FLSA, 29 U.S.C. § 203(d). IPI operates a casino in Saipan and is building a hotel complex including the casino.

13. IDS is, and at all relevant times was, an employer within the meaning of the FLSA, 29 U.S.C. § 203(d), and Department of Labor regulations, 29 C.F.R. Part 791, in that it acted directly or indirectly in the interest of IPI in relation to Plaintiffs and other similarly situated employees.

14. At all relevant times, each Defendant is and was an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(s)(1)(A), in that (i) each Defendant has employees engaged in commerce or in the production of goods for commerce, or has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and (ii) each Defendant is an enterprise whose annual gross volume of sales made or business done is not less than $500,000.

15. Additionally, Plaintiffs are covered by the FLSA, under 29 U.S.C. §§ 206(a) and 207(a), because at all relevant times in any workweek they were and are engaged in commerce or in the production of goods for commerce.

## FACTS

### The H-2B Program

16. The H-2B nonimmigrant program permits employers to temporarily hire nonimmigrants to perform nonagricultural labor or services in the United States.

17. An employer seeking the admission of H-2B workers must first file a temporary labor certification application with the DOL, pursuant to 20 CFR § 655.20 (2008), including an attestation from the employer that it will abide by certain regulatory requirements.

18. One such requirement is to offer a wage that equals or exceeds the highest of the prevailing wage, applicable federal minimum wage, state minimum wage, or local minimum wage to the H-2B worker for the occupation in the area of intended employment during the entire period of the approved H-2B labor certification.

19. Another is the timely payment of wages to the worker in cash or negotiable instrument paid at par, made finally and unconditionally and "free and clear."

20. Deductions from wages must be limited to those required by law and the reasonable cost of board, lodging, and facilities furnished.

21. DOL has determined that employers must pay H-2B workers a subsistence including meals and lodging during the workers' travel from their hometown to the consular city to wait to obtain a visa.

### The Promises Defendants Made to Plaintiffs When Recruiting Them in Turkey

22. In Turkey, IDS recruited Plaintiffs to build the Imperial Palace hotel in Saipan.

23. The recruited workers were highly skilled and experienced electricians, carpenters, welders, and plumbers.

24. IDS gave Plaintiffs a Letter of Commitment (Taahhütname) naming IPI as the employer and setting forth the terms of employment.

25. The Letter of Commitment, for a six-month work period, stated that foremen would receive $10.50 per hour and $15.75 for overtime hours, and that other workers would receive $8.35 per hour and $12.52 for overtime hours.

26. The Letter of Commitment promised the Turkish workers 270 hours of work per month: 176 hours of regular pay plus 94 hours of overtime pay.

27. The promise of consistent overtime hours and pay that would allow the workers to remit money home to help their families pay bills and put children through school induced Plaintiffs to accept Defendants' offer of work.

28. IDS, acting on behalf of IPI, reached an oral agreement with Turkish foremen to pay them US$3,000.00 a month.

29. The Letter of Commitment promised that the employer would provide three meals a day prepared by a Turkish cook.

30. The Letter of Commitment promised that life insurance and insurance for workplace accidents would be provided.

31. The Letter of Commitment promised three days' paid sick leave every six months.

32. The Letter of Commitment promised that if an employee extended his contract for a second six months, he would be entitled to six days' paid leave and provided an airline ticket home or, if he did not wish to visit home on leave, the cash value of a ticket.

33. Before visa processing began, Plaintiffs were required to give a promissory note in the amount of 30,000 Turkish lira (approximately US$4,000.00) to IPI and to find a guarantor.

34. To obtain a visa, Plaintiffs and similarly situated Turkish workers had to travel from their hometowns to Ankara for interviews at the U.S. Embassy.

35. Plaintiffs' expenses for travel to the U.S. Embassy were not fully compensated.

**The Work Begins in Saipan, and Defendants Begin to Break Their Promises**

36. When Plaintiffs arrived in Saipan in January 2020, they were destitute. Many had had to borrow money from friends and relatives to cover travel expenses.

37. Defendants broke their promise in the Letter of Commitment to provide a Turkish cook. The meals that IPI offered were prepared to the taste of Chinese workers and was, for the Turkish workers, practically inedible.

38. Plaintiffs had to pool resources to buy food and cook for themselves.

39. From January through May, Plaintiffs worked 7:30 a.m. to 6:30 p.m., Monday through Saturday, which came out to about the 270 hours of regular and overtime hours promised in the Letter of Commitment.

40. However, beginning in June 2020, Plaintiffs' hours were drastically cut. All overtime was eliminated, leaving Plaintiffs with no more than 40 hours of regular wages earned per week and falling far short of Defendants' promise in the Letter of Commitment.

41. In mid-January, Volkan Köymen ("Volkan"), IDS's Pacific Projects Director and a company representative of IPI, arrived in Saipan, and Plaintiffs complained to him about their living conditions. Volkan told them that Bülent Peker, IDS's owner, would be arriving soon and their problems would be solved.

42. When Mr. Peker arrived, he told Plaintiffs that they would be reimbursed for all Western Union transfer fees.

43. Volkan, Project Manager Mustafa Turan ("Mustafa"), and Bülent Peker promised Plaintiffs that Western Union fees of $40 per transaction to send money home to Turkey would be covered by IDS. IDS reneged on this promise and has never reimbursed Plaintiffs for these fees.

44. Volkan told Turkish workers who extended their contracts for a second six months and chose not to take leave in Turkey that Defendants wouldn't honor their promise to compensate them with the cost of a plane ticket.

45. Plaintiffs were paid biweekly, on every other Friday one week after the end of each pay period.

46. In violation of H-2B regulations, Defendants typically did not give Plaintiffs a paystub showing the deductions that had been made.

47. Three workers, including named Plaintiff Süleyman Köş, were promoted to foreman but continued to be paid at the lower rate for construction workers.

48. When Plaintiffs arrived in Saipan, IPI had them sign documents subscribing to medical and dental coverage with TakeCare Insurance Company.

49. Healthcare insurance premiums were deducted pre-tax from Plaintiffs' biweekly paychecks.

50. However, when sick workers went to the hospital (CHCC) for treatment, they were told that their insurance with TakeCare had been suspended for nonpayment of premiums.

51. On information and belief, Plaintiffs' health care coverage is still suspended.

52. In the first months that Plaintiffs worked for Defendants, they were given paid sick leave when a doctor prescribed rest. Later, however, Volkan and Mustafa began recording sick leave days as absences on the time sheets, and workers were not compensated for those days.

### Defendants Start Missing Paydays and Start Going Weeks Without Paying Plaintiffs

53. On June 19, 2020, a scheduled payday, IPI failed to pay Plaintiffs in Saipan for work they had performed in Pay Period No. 13, for the weeks of May 31 and June 7.

54. Volkan told Plaintiffs that instead of paying them in U.S. dollars in Saipan, as required by law, IPI had sent covering funds to IDS executives in Turkey for deposit in a Turkish bank account that would be accessible when Plaintiffs returned to Turkey. Plaintiffs did not consent to this arrangement.

55. Transfer of funds into an IDS account in Turkey does not satisfy an H-2B employer's obligation to timely pay wages to workers either in cash or negotiable instrument at par, under 29 C.F.R. § 655.20(b).

56. In the following weeks, Pay Periods No. 14 through 19 were paid late – sometimes a week late, sometimes longer. By early September, Plaintiffs had not been paid by IPI for more than a month.

57. On September 11, 2020, the scheduled payday for Pay Period No. 19, IPI failed to pay Plaintiffs for their hours worked. Foremen complained to Volkan and Mustafa that they had no money in their pockets for which even to pay for basic necessities, and requested an advance of $100 cash per worker. Volkan and Mustafa advanced each worker only $20.

58. At about 3 p.m. on September 11, after IPI yet again failed to meet its obligation to pay workers on time, Plaintiffs stopped work in protest and returned to their barracks.

59. During the ensuing three-week work stoppage, Defendants stopped providing Plaintiffs with drinking water and internet service at their barracks.

60. Volkan and Mustafa told Plaintiffs that IPI was behind in their progress payments and that therefore IDS was unable to continue providing services.

61. Sometime in early October, IPI fired IDS, and Volkan and Mustafa left Saipan.

62. After IDS left, Plaintiffs no longer had access to a vehicle and had to rent one and pay for gasoline, which Defendants previously had supplied.

63. On September 25, 2020, a scheduled payday, IPI failed to pay Plaintiffs for work they had performed in Pay Period No. 20 for the week of September 6 and 13.

64. On October 1, 2020, IPI paid seventeen of the Turkish workers for Pay Period No. 20 and twenty-six for No. 13. Eleven workers, including Hasan, remain unpaid for No. 20, and two workers, including Ozcan, remain unpaid for No. 13.

65. On October 5, 2020, at 8:00 a.m., at IPI's behest, Plaintiffs reported to IPI offices on Capitol Hill to be transported back to the worksite and resume work.

66. However, also that morning at 8:00 a.m., IPI announced that three of the leaders of the Turkish workers – Özcan Genç, Hasan Gökçe, and Mehmet Karakaya – were being suspended pending an investigation into alleged threats they had made to Volkan and Mustafa.

67. These allegations were spurious, and after three days IPI lifted the suspension.

68. On information and belief, the real reason for the suspension was to punish worker leaders and placate IDS, whom IPI was hoping would remain in Saipan to manage the Turkish workers.

69. Since October 1, IPI has not paid Plaintiffs at all. IPI missed scheduled paydays for Pay Period No. 21 on October 9, No. 22 on October 23, and No. 23 on November 6.

# FIRST CAUSE OF ACTION
## Fair Labor Standards Act Collective Action for Failure to Pay Minimum Wages and Overtime Wages

70. All foregoing allegations are realleged and incorporated by reference as if set forth fully herein.

71. Plaintiffs bring this action on behalf of themselves and other similarly situated current and former H-2B workers as authorized under 29 U.S.C. § 216(b).

72. The FLSA requires covered employers to pay non-exempt employees a regular wage that is no less than the minimum wage of $7.25 an hour, and no less than one-and-a-half times their regular pay rate for hours worked in excess of 40 hours in a workweek.

73. Late payment – the failure to issue employees their paychecks promptly when due – violates the FLSA and triggers FLSA provisions concerning liquidated damages and prejudgment interest, as well as failing to meet H-2B employers' obligation to pay wages when due under 29 C.F.R. § 655.20(h).

74. Defendants have not properly and timely compensated Plaintiffs for their regular hours worked in Pay Periods No. 21, 22, and 23.

75. Eleven individual plaintiffs have still not been compensated for Pay Period No. 13, and two have still not been compensated for Pay Period No. 20.

76. On or about November 13, 2020, IPI handed out $500 checks to some construction workers of other nationalities who have not been paid their regular wages, but didn't make any payments to Turkish workers.

77. The late payments made to some of the Plaintiffs for Pay Periods No. 13 and 20 violated the FLSA's requirement to pay workers promptly when due.

78. For most pay periods, Defendants were not given pay stubs and could not verify that they were paid fully and without deductions not required by law.

79. At all relevant times, Defendants have been aware of the provisions of the FLSA and knew that they were subject to those provisions.

80. Defendants' actions and omissions as alleged herein were willful and knowing violations, in bad faith, of the FLSA's provisions for payment of regular wages and overtime wages.

81. Under the FLSA, 29 U.S.C. § 216(b), Defendants are liable to pay an additional equal amount as liquidated damages, interest, reasonable attorney fees and the costs of this action.

82. Although IPI cuts the workers' paychecks and sponsored them for H-2B visas, IDS is equally liable as an employer within the meaning of the FLSA.

83. Because the employment and work records for Plaintiffs are in the exclusive possession, custody and control of Defendants, Plaintiffs are unable to state at this time the exact amounts owing to them.

## SECOND CAUSE OF ACTION
### Retaliation in Violation of the FLSA

84. All foregoing allegations are realleged and incorporated by reference as if set forth fully herein.

85. Plaintiffs' work stoppage on September 11, 2020, in protest of Defendants' repeated failure to pay Plaintiffs on time as required by the FLSA, was protected activity under the FLSA.

86. In response to the work stoppage, Defendants cut off the supply of drinking water and internet service that Defendants need to stay in touch with their families in Turkey.

87. When Plaintiffs went back to work in early October, Defendants suspended three worker leaders in punishment for the work stoppage and to discourage further protected activity.

88. Defendant IDS is liable both as an employer within the meaning of the FLSA and because its managers Volkan and Mustafa pressured IPI to suspend the three worker leaders.

89. As a result of Defendants' unlawful retaliation, Plaintiff suffered damages.

### THIRD CAUSE OF ACTION
### Breach of Contract

90. All foregoing allegations are realleged and incorporated by reference as if set forth fully herein.

91. The Letter of Commitment that Defendants gave Plaintiffs in Turkey is a valid and binding contract between Plaintiffs and Defendants.

92. Plaintiffs satisfactorily performed their employment duties and responsibilities under their employment contract.

93. Defendants breached the contract by failing to provide all the work hours promised or the monthly wage promised, failing to provide a Turkish cook, failing to provide roundtrip airfare home to Turkey for workers owed leave after six months, failing to provide health insurance, and failing to provide paid sick leave.

94. As a result of the breach, Plaintiffs suffered injuries for which they are entitled to actual and consequential damages and prejudgment interest.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A. Conditional certification of the proposed collective action on behalf of the named plaintiffs and all similarly situated H-2B workers recruited from Turkey by Defendants to work at IPI's hotel construction site.

B. A declaration that Defendants have willfully and in bad faith violated the applicable minimum wage and overtime wage provisions of the FLSA and regulations implementing the FLSA;

C. An order for a complete and accurate accounting of all the compensation to which Plaintiffs are entitled;

D. Judgment against Defendants awarding Plaintiffs monetary damages in the form of back pay and liquidated damages, plus pre-judgment and post-judgment interest;

E. An award of reasonable attorney fees as well as the costs of this action, including translator's fees;

F. An award granting such further relief as the Court deems proper.

## JURY DEMAND

Plaintiffs demand a jury trial pursuant to the Seventh Amendment to the Constitution and Rule 38 of the Federal Rules of Civil Procedure.

Dated: November 20, 2020

BANES HOREY BERMAN & MILLER, LLC

*[signature]*

by Richard C. Miller, F0458
Attorney for Plaintiff