FILED
Clerk
District Court

FEB 24 2022

for the Northern Mariana Islands
By_____
(Deputy Clerk)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| ÖZCAN GENÇ, HASAN GÖKÇE, and SÜLEYMAN KÖŞ, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>IMPERIAL PACIFIC INTERNATIONAL (CNMI), LLC, and IMPERIAL PACIFIC INTERNATIONAL HOLDINGS, LTD.,<br><br>Defendants. | Civil Case No. 1:20-cv-00031<br><br>**DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL DEFAULT JUDGMENT** |

Before the Court is Plaintiffs' Motion for Entry of Partial Default Judgment on their Fair Labor Standards Act ("FLSA") claims for unpaid minimum wages and overtime wages, and for retaliation against Defendants Imperial Pacific International (CNMI), LLC and Imperial Pacific International Holdings, Ltd. (collectively "IPI").[1] (Mot. for Partial Default J., ECF No. 16.) The three named Plaintiffs represent a collective action of 29 Turkish workers,[2] some of whom have returned to Turkey since the initiation of this civil action. To date, IPI has yet to enter an appearance in this case. For the reasons below, the Court GRANTS Plaintiffs' Motion for Partial

---

[1] At the initiation of this suit, Plaintiffs sought damages from a third Defendant: IDS Development Management and Consultancy. However, Plaintiffs have been unable to serve or reach IDS representatives, and IDS has since been dismissed as a defendant. (Order Dismissing IDS, ECF No. 44.)

[2] Originally, 28 Turkish workers opted-in to join the FLSA collective action. On December 29, 2021, Fuat Mert Öztuna filed his opt-in consent form (ECF No. 9), making him the 29th member of the collective action.

Default Judgment but for the total lesser amount of $477,935.91. The total specific amounts are as follows: $312,288.91 in unpaid minimum wages, unpaid overtime, and liquidated damages for the first cause of action, plus $165,647.00 in punitive damages for the retaliation claim under the second cause of action—totaling $477,935.91 in damages due under the FLSA.

## I.    FACTUAL BACKGROUND

In 2019, several highly skilled and experienced Turkish electricians, carpenters, welders, and plumbers were recruited in Turkey by Defendant IDS Development Management and Consultancy ("IDS") to build IPI's hotel-casino complex in Garapan, Saipan.[3] To entice the Turkish workers, IDS presented letters of commitment ("Taahhütname" in Turkish) naming IPI as the employer and laying out a number of attractive terms and conditions of employment in Saipan. (ECF Nos. 13-1 (Turkish), 13-2 (English).) Foremen would receive $10.50 per hour in regular pay and $15.75 per hour in overtime; all other general construction workers would receive $8.35 per hour in regular pay and $12.52 per hour in overtime. (Compl. 6 ¶ 25, ECF No. 1.) All workers stood to earn more than the federal minimum wage of $7.25 per hour. (*Id*. at 11 ¶ 72.)

Plaintiffs were each promised a total of 270 hours of work per month: 176 regular work hours and 94 overtime hours. (*Id*. at 6 ¶ 26.) The letters of commitment had other additional guarantees such as: (1) health and life insurance; (2) workmen's compensation; (3) annual and sick leave; (4) a return ticket to Turkey, should the Plaintiffs extend their stay in Saipan past six months;

---

[3] IDS, a company registered in several countries including Turkey, recruits workers in Turkey and the Middle East for construction projects around the world. (Compl. 4 ¶ 11, ECF No. 1.)

and (5) meals specifically prepared by a Turkish cook.[4] (*Id*. at 6 ¶¶ 29, 30, 31, 32)

Attracted by the offer, Plaintiffs set out to begin processing the paperwork for their travels to and employment in Saipan. To do this, IDS required Plaintiffs to provide IPI a promissory note worth 30,000 Turkish lira, approximately $4,000.00, and to find a guarantor. (*Id*. at 7 ¶ 33.) Plaintiffs also needed to travel from their various hometowns to Ankara, Turkey for interviews at the U.S. Embassy.[5] This trip enabled Plaintiffs to acquire U.S. H-2B nonimmigrant visas, which allows employers to hire nonimmigrants to perform nonagricultural labor or services in the United States. (*Id*. at 5.) Their paperwork was successfully processed, and Plaintiffs embarked on their journeys half-way around the world.

Almost immediately, IPI breached its letters of commitment. For instance, IPI did not provide Turkish meals; rather, IPI prepared Chinese-tasting food which was, "for the Turkish workers, practically inedible." (*Id*. at 7 ¶ 37.) Further, IDS's Pacific Projects Director and IPI company representative Volkyan Koymen indicated that IPI would not honor their promise to compensate eligible Turkish workers for their return ticket to Turkey. (*Id*. at 8 ¶ 44.) Additionally, at least three workers were promoted to foreman but continued to be paid at the lower rate for general construction workers. (*Id*. at 8 ¶ 57.) Moreover, although healthcare insurance premiums were deducted from Plaintiffs' biweekly paychecks, they soon learned that their health insurance

---

[4] Apparently, IDS, acting on behalf of IPI, orally agreed with the Turkish foremen that it would pay them $3,000.00 a month. (Compl. 6. ¶ 28) No discussion of that $3,000.00 was made past this representation in Plaintiffs' Complaint.

[5] Their travel expenses to Ankara "were not fully compensated." (*Id*. at 7 ¶ 35.)

"had been suspended for nonpayment of premiums." (*Id*.)

In June 2020, payments began to dwindle precipitously. Plaintiffs' hours were cut: "All overtime was eliminated, leaving Plaintiffs with no more than 40 hours of regular wages earned per week." (*Id*. at 7 ¶ 40.) Compensation arrived late—sometimes a week, sometimes longer. "By early September, Plaintiffs had not been paid by IPI for more than a month." (*Id*. at 9 ¶ 56.) IPI continued to remunerate compensation well past the biweekly deadlines, sometimes failing to provide payment altogether. To date, IPI has yet to make an appearance in this matter and has yet to fully compensate Plaintiffs.

Frustrated with the many failed obligations to remunerate payment, Plaintiffs stopped work in an act of protest. (*Id*. at 9 ¶ 58.) For the three weeks after Plaintiffs halted work, IPI "stopped providing Plaintiffs with drinking water and internet service at their barracks." (*Id*. at 10 ¶ 59.) Some members even stated that food services were also terminated: "they cut internet, our food, bread and water, they did not make salary payments." (Decl. Tekten 4, ECF No. 4-4.) Eventually, on October 5, 2020, at IPI's behest, Plaintiffs returned to work. (*Id*. at ¶ 65.) That same morning, however, three of the leaders of the Turkish workers—Özcan Genç, Hasan Gökçe, and Mehmet Karakaya—were suspended for alleged threats to IDS officials. (*Id*. at 10 ¶ 66.) "These allegations were spurious, and after three days IPI lifted the suspension." (*Id*.)

## II.   PROCEDURAL HISTORY

On November 20, 2020, Plaintiffs Genç, Gökçe, and Kös filed a complaint and jury demand with this Court. (Compl., ECF No. 1.) They asserted three causes of action: (1) FLSA Collective Action for minimum wage and overtime violations, (2) FLSA retaliation violations, and

(3) state-law breach of contract. On behalf of themselves and 26 other Turkish workers similarly situated, the three named Plaintiffs sought certification as an FLSA collective action on December 10, 2020.[6] In total, 29 Turkish workers filed signed consent forms opting into the FLSA collective action.[7] (Consent Forms, ECF Nos. 4-5 through 4-8; *see also* Names of Opt-In Plaintiffs, ECF No. 12.) The Court preliminary certified the collective action on December 30, 2020 and finalized certification on February 8, 2021. (ECF Nos. 11 and 21.)

Plaintiffs also moved for entry of default against IPI as it did not plead or defend within the time permitted by the Federal Rules of Civil Procedure. The Clerk entered an amended entry of default against IPI the same day this Court preliminarily certified the collective action in December 2020. (ECF No. 10.) On January 18, 2021, Plaintiffs moved for partial default judgment on the first two causes of action under the FLSA. (Mot. for Partial Default J., ECF No. 16.) The Court subsequently held an initial hearing on the matter and received testimony from two of the

---

[6] The Court will not address the merits of the state-law breach of contract claim. Plaintiffs are pursuing a Rule 23 class action for their breach of contract claim, and the Motion for Partial Default Judgment relates only to IPI's FLSA violations.

[7] After certification, Plaintiffs sought to include Fuat Mert Öztuna as the 29th member. (*See* Decl. Öztuna 3, ECF No. 20.) Here, Öztuna claims the same wage violations under the FLSA, is similarly situated in that he was not timely paid or at all, resided in the same barracks when the internet service and drinking water were stopped in response to protests that he participated in, and has opted into joining the litigation. *See Campbell v. City of Los Angeles*, 903 F.3d 1090, 1100 (9th Cir. 2018) (enumerating requirements of FLSA collective action). Like the other members of the FLSA collective action, Öztuna was recruited in 2019 to work in Saipan pursuant to the terms and conditions of the letter of commitment. (*See* Decl. Öztuna, ECF No. 20.) Although he is on a different pay scale as a manager and is missing payments for different pay periods, the Court agrees with Plaintiffs: "He still has FLSA claims against the same employer for the same types of violations arising from the same misconduct." (Plaintiffs Br. 2, ECF No. 25.) Any differences are "minor." *Id.* Thus, at least for purposes of the FLSA claims, Öztuna may be considered part of the collective action.

workers. (Min., ECF No. 18.) Due to translation difficulties, the Court urged Plaintiffs to submit a detailed and organized written compilation of statements and figures regarding the amount of damages sought. Plaintiffs submitted a series of affidavits, spreadsheets, and other documents supporting their claim of damages.[8] Based on these submissions, Plaintiffs request a total of $1,249,470.42 in damages. (*See* Second Am. Statement of FLSA Damages, ECF No. 31 at 2.)

This $1.2 million figure resulted from an evolution of calculations. Since the initiation of this action, Plaintiffs have amended their statement of damages for various reasons, including revisions to reflect (1) the contractual rates for certain individual members (*see* ECF No. 29 (noting that certain members receive foremen rates)) and (2) that the FLSA only guarantees unpaid wages up to the minimum wage rate (*see* Decl. Miller, ECF No. 31-1). Additionally, in a separate matter with IPI as a named Defendant, the U.S. Secretary of the Department of Labor ("Secretary") moved for a finding of civil contempt against IPI entities for failure to remit payment to 136 workers under a 2019 Consent Judgment. *See* Order Appointing Receiver and Setting Terms of Receivership, *Acosta v. IPI et al.*, 1:19-cv-00007 (D. N. Mar. I. Mar. 10, 2021), ECF No. 50. The Court found IPI in civil contempt and ordered IPI to immediately pay back wages to the 136 workers who performed services in 2016 and 2017, and also required IPI to immediately pay

---

[8] Plaintiffs have submitted several documents to establish damages and the calculations thereof. For purposes of tabulating damages, the Court relies on the Complaint (ECF No. 1); the Second Amended Statement of Damages filed on March 4, 2021 (ECF No. 31), which includes the spreadsheets for each individual plaintiff (ECF No. 31-1); and the total FLSA damages spreadsheet (ECF No. 31-2). The Court further relies on representations in various declarations and affidavits by Plaintiffs, their counsel, and counsel's administrative staff. (*See, e.g.*, Decl. Miller, ECF No. 31-1; Decl. Antonia Banes, ECF No. 26-1; Decl. Hasan Gocke, ECF No. 19.)

$788,022.54 in 2020 and 2021 unpaid wages. Order Finding Civil Contempt and Imposing a Stop Work Order, *Acosta v. IPI et al.*, 1:19-cv-00007 (D. N. Mar. I. Jan. 21, 2021), ECF No. 19. The Court takes judicial notice of these circumstances and that IPI has since the filing of this lawsuit made substantial payments to the more recent unpaid wages, including members of this FLSA collective action. *See United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) ("[A] court may take judicial notice of its own records in other cases"). Plaintiffs themselves recognize the payments made by IPI on January 21, 2021 which was during the pendency of this case. (ECF No. 19-2). Although these payments result in a reduced total amount owed in unpaid minimum wages and overtime compensation by the time of the partial default judgment hearing, Plaintiffs correctly note that regardless of any offset for wages IPI actually paid, they may still be owed liquidated damages in the full amount of the minimum wage and overtime earned for every pay period they were not paid on time. *See Biggs v. Wilson,* 1 F.3d 1537, 1544 (9th Cir. 1993) (failing to issue paychecks promptly when due violates the FLSA; paychecks are due on payday); 29 U.S.C. § 216(b) (liquidated damages). The specific amount of damages now requested in pursuit of Plaintiffs' FLSA claims is as follows:

    (1) Unpaid Wages             $24,997.53;

    (2) Liquidated Damages      $287,291.38; and

    (3) Punitive Damages        $937,181.51.

(Second Am. Statement of FLSA Damages, ECF No. 31-2.)  To calculate unpaid wages, data for each Plaintiff was provided as follows:

(1) Minimum wage and regular (contractual) rates;[9]

(2) Total hours worked, separated between hours worked at the minimum wage rate and overtime hours (ECF No. 31-1);

(3) Total balance due for hours worked at the minimum wage rate of $7.25 (*id.*);

(4) Total balance due for overtime hours which requires multiplying the regular (contractual rate) by one and one-half (*id.*); and

(5) Total final balance due.

(*Id.*)

To calculate liquidated damages, Plaintiffs submitted additional data that shows a comparison of the scheduled pay date and the actual date paid, totaling the number of days IPI was late on payment. (ECF No. 19-2.) The total amount of liquidated damages owed is calculated by adding the late unpaid minimum wages and overtime backpay.[10] (ECF No. 31-2.) The 25 general construction workers are allegedly owed $9,056.82 each, the five foremen are owed $9,935.38 each, and Öztuna is owed $29,307.75 for a total of $287,291.38 in liquidated damages. (*Id.*)

Plaintiffs also request a total of $937,181.51 in punitive damages by multiplying the final balance due against multipliers of four, three, and two, dependent on IPI's level of culpability

---

[9] As discussed *infra*, while unpaid minimum wages are calculated by multiplying the minimum wage rate (which is currently $7.25 per hour under 29 U.S.C. § 206) against regular work hours, overtime is calculated by multiplying one and one-half times the employee's regular rate (i.e., the contractual rate) against overtime hours.

[10] Liquidated damages were calculated using the minimum wage rate for regular hours and regular (contractual) rate for overtime hours. *See* 29 U.S.C. § 216(b) (calculating liquidated damages as an additional equal amount of unpaid minimum wages and/or unpaid overtime compensation).

against each Plaintiff. The three leaders who were suspended for alleged threats against IDS—Özcan Genç, Hasan Gökçe, and Mehmet Karakaya—had their final balance multiplied by four. The group of 25 Plaintiffs had their total final balance multiplied by three. (*Id*.) Fuat Mert Öztuna, who stopped working for IPI prior to the September 2020 walkout from the construction of IPI's hotel-casino complex, is the only worker who had his final balance multiplied by just two.

In further arguing for punitive damages, Plaintiffs point out that while several members of the collective action have repatriated to Turkey, IPI has frustrated Plaintiffs' circumstances even during the repatriation process. Prior to their scheduled departure date of February 8, 2021, several of the members were informed that IPI would provide $250.00 to "defray the cost of food, transportation, and other travel expenses for the 4-day trip to Turkey." (Decl. Sablan 2, ECF No. 24.) The morning of departure, however, IPI represented to the repatriating Plaintiffs that they would not release the $250.00 unless they signed a "General Release" Form. (*Id*. at 2.) This General Release stated that IPI would provide $250.00, and "[i]n consideration of such payment, [plaintiff] agrees to accept the payment as full and complete settlement and satisfaction of any present and prospective claims." (General Release Ex., ECF No. 24-1.) Apparently, "the document was not translated into Turkish for the workers, and they were unable to talk to their lawyer before they signed as it was 5 a.m., their time was limited, and they had to check in for their flight." (Decl. Sablan 2, ECF No. 24.) This General Release was also brought to the Court's attention in another lawsuit involving IPI. On February 12, 2021, this Court issued an Order in that other lawsuit, which nullified the General Release except as a receipt. The General Release would "not act as a bar or [be] used as a bar by [IPI] or anyone in any manner against any claim . . . ." Order Nullifying

General Release, *Acosta v. IPI et al.*, No. 1:19-cv-00007, (D. N. Mar. I. Feb. 12, 2021), ECF No. 31.

## III.    LEGAL STANDARD

Parties must apply to the court for default judgment when the claim is not for a sum certain. Fed. R. Civ. P. 55(b)(2). Courts have discretion whether to enter default judgment. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). In reviewing a claim for default judgment, all well-pleaded factual allegations in the complaint are taken as true. *DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007). However, while detailed factual findings are not required by the moving party, legally insufficient claims or facts not within the pleadings are not established by default. *Trident Inv. Partners, Inc. v. Evans*, 2021 WL 75826, at *2 (D. Ariz. Jan. 8, 2021). The following factors, known as the *Eitel* factors, evaluate the propriety of default judgment: (1) possible prejudice to plaintiffs, (2) the merits of plaintiffs' substantive claims, (3) the sufficiency of the complaint, (4) the sum of money at stake in the suit, (5) possible disputes concerning material facts, (6) whether default is due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring a decision on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

## IV.    DISCUSSION

All seven *Eitel* factors weigh in favor of granting default judgment as to Plaintiffs' FLSA claims. On the first cause of action, Plaintiffs are entitled to default judgment and are entitled to unpaid wages, unpaid overtime, and liquidated damages totaling $312,288.91. (ECF No. 31-2.) Furthermore, on the second cause of action, the Court finds that the FLSA anti-retaliation provision

does provide for punitive damages. However, because punitive damages are limited to violations of FLSA's anti-retaliation provision at 29 U.S.C. § 215(a)(3), and is not available for a violation of the FLSA's minimum wage and overtime requirements, the Court reduces Plaintiff's requested punitive damages amount from $937,181.51 to $165,647.00. The reasons for granting default judgment in a total damages award of $477,935.91 follows.

## A. Default Judgment

Plaintiffs maintain that all seven *Eitel* factors favor granting default judgment. First, Plaintiffs argue that non-resolution would significantly prejudice them, particularly given their imminent repatriation to Turkey and inability to return to Saipan. Plaintiffs additionally assert that their Complaint sufficiently establishes meritorious claims of FLSA wage and retaliation violations. Furthermore, the amount at stake is reasonable given that it is mandatorily owed to Plaintiffs pursuant to the FLSA and given IPI's egregious behavior. Finally, IPI's non-appearance "despite extensive publicity concerning this lawsuit in the local media," reinforces Plaintiffs' position that there is no material dispute, no excusable neglect on the part of IPI, and that the general policy in favor of decisions on the merits "has little force" where IPI has failed to appear. (Mot. for Partial Default J. 7, ECF No. 16.) The Court will address each *Eitel* factor in turn.

### 1. Possible Prejudice

The first *Eitel* factor asks if Plaintiffs would suffer prejudice if default judgment is not entered. Courts have construed the failure to appear or participate as precluding recourse for recovery. *See Vogel v. Rite Aid Corp.*, 992 F. Supp. 2d 998, 1007 (C.D. Cal. 2014) (holding that "[a]bsent an entry of default judgment, [plaintiff] will most likely be without recourse against

[defendant], given [defendant's] unwillingness to cooperate and defend. Because [plaintiff] will suffer prejudice if he is without recourse against [defendant], this factor favors entry of a default judgment."); *Landstar Ranger, Inc. v. Parth Ent., Inc.*, 725 F. Supp. 2d 916, 920 (C.D. Cal. 2010) ("Denying default judgment here would leave [plaintiff] without a proper remedy.").

Without moving towards a resolution, Plaintiffs will be unable to obtain relief or argue this case on the merits, particularly since IPI has refused to litigate otherwise. Complicating matters is Plaintiffs' impending return to their homeland of Turkey, half-way around the world from Saipan. Indeed, many have already returned. Immigration restrictions, the global COVID-19 pandemic, and general costs of traveling preclude Plaintiffs' return. Failing to grant default judgment would translate to virtually zero opportunity for Plaintiffs to obtain meaningful resolution. Prejudice is not only possible—it is imminent without judicial relief.

### 2. Merits and Sufficiency of the Claim

The two factors concerning the merits of Plaintiffs' claims and the sufficiency of their claims are perhaps the most important *Eitel* factors to establish. *See Vietnam Reform Party v. Viet Tan-Vietnam Reform Party*, 416 F. Supp. 3d 948, 962 (N.D. Cal. 2019). The Court must ask: taken as true, do Plaintiffs' factual allegations in their Complaint sufficiently show that IPI violated the FLSA?

#### i. *FLSA Wages*

In 1938, Congress established the FLSA to address detrimental labor conditions of commercial enterprises affecting the "health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). The FLSA mandates the minimum standards of treatment of employees who work

for an "enterprise engaged in commerce or in the production of goods for commerce." *Id.* §
206(a).[11] Employers must pay each employee a minimum wage, as determined by federal law. *Id*.
§ 206(a).[12] In addition, employees who work more than 40 hours in one week must be paid a rate
not less than one and one-half times the regular rate of his or her employment. *Id*. § 207(a)(1).
Employers who violate those provisions "shall be liable" to their employees "in the amount of
their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in
an additional equal amount as liquidated damages." *Id*. § 216(b).

Plaintiff-employees have the burden to prove the work performed for which they were not
properly compensated. *Ader v. SimonMed Imaging Inc.*, 465 F. Supp. 3d 953, 964 (D. Ariz. 2020).
"Detailed factual allegations" are not required to state a plausible claim, but "conclusory

---

[11] The FLSA outlines various definitions at 29 U.S.C. § 203. "Employees" are individuals employed by an employer,
29 U.S.C. § 203(e)(1), and "employers" are those persons "acting directly or indirectly in the interest of an employer
in relation to an employee," *id*. § 203(d); *see Lambert v. Ackerley*, 180 F.3d 997, 1011-12 (9th Cir. 1999) (en banc)
(giving definition of employer "an expansive interpretation in order to effectuate the FLSA's broad remedial
purpose."). Employees who work for an "enterprise engaged in commerce or in the production of goods for commerce"
handle, sell, or otherwise work on goods or materials that have been moved in or produced for commerce and includes
enterprises that have an annual gross volume of business not less than $500,000.00. 29 U.S.C. § 203(s)(1).

Here, Plaintiffs are all non-exempt covered employees within the meaning of the FLSA and have an employer-
employee relationship with IPI. IPI is subject to the FLSA as an employer and meets the standards of an enterprise
with employees engaged in commerce or in the production of goods for commerce. (Compl. 4 ¶ 14, ECF No. 1.) IPI
is additionally a commercial enterprise whose annual gross volume is not less than $500,000.00. (*Id*.) Per the FLSA,
Plaintiffs handle, sell, or otherwise work on goods or materials that have been moved in or produced for commerce.
29 U.S.C. § 203(s)(1).

[12] Because Plaintiffs were employed via the H-2B nonimmigrant visa, U.S. immigration law also mandates certain
employment conditions on the part of the employer, including providing wages consistent with federal, state, and local
law. *See* 20 C.F.R. § 655.20(a) (2015). In addition, federal H-2B regulations also have their own set of anti-retaliation
provisions. *See* 20 C.F.R. § 655.20(n) (2015).

allegations that merely recite the statutory language" are inadequate. *Landers v. Quality Comm., Inc.*, 771 F.3d 638, 644 (9th Cir. 2014) (finding plaintiff did not allege plausible facts concerning overtime). "[T]he plausibility of a claim is 'context specific,' [and a] plaintiff may establish a plausible claim by estimating." *Id*. at 645 (internal citations omitted). "Obviously, with the pleading of more specific facts, the closer the complaint moves toward plausibility." *Id*. Proximity is not essential, since the FLSA requires employers to keep accurate records. *See* 29 U.S.C. § 211(c).

Plaintiffs have met their burden to show they performed work for which they have not been compensated for. Plaintiffs have submitted extensive documentation including sworn affidavits that illustrate IPI's failure to comply with federal law. For instance, Plaintiffs, who were to be paid a minimum wage of $7.25 per hour, are still each owed anywhere between $300.00 to over $1,000.00. (*See* Second Am. FLSA Total Damages Spreadsheet, ECF No. 31-2.) Indeed, other matters before the Court show that Plaintiffs, among other former IPI employees, were either underpaid or not paid at all. *See* Payroll Documents, *Acosta v. IPI et al*, 1:19-cv-00007 (D. N. Mar. I. Mar. 3, 2021), ECF No. 47. The Court takes judicial notice of this corroborating information. IPI additionally failed to *timely* pay Plaintiffs for *every* pay period beginning in June 2020 through December 2020. What Plaintiffs were actually paid is a far cry from what IPI's letters of commitment articulated they would be paid—and when. Among the many individuals who were not paid or who were paid late, Plaintiffs have met their burden to sufficiently establish a meritorious claim for unpaid minimum wages and overtime.

/ /

14

ii.    *Retaliation*

The FLSA also prohibits discriminating against an employee because the employee "has filed a complaint" or initiated a proceeding against the employer. 29 U.S.C. § 215(a)(3). The provision is meant to be "interpreted expansively." *Ader*, 465 F. Supp. 3d at 975. "To establish a *prima facie* case of retaliation, a plaintiff must show (1) he engaged in activity protected by the FLSA; (2) the defendant took an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Id*. (citation omitted). Protected activity may be construed as "conduct that reasonably could be perceived as directed towards the assertion of rights protected by the statute." *Campbell-Thomson v. Cox Comm.*, 2010 WL 1814844, at *5 (D. Ariz. May 5, 2010). This includes protesting an unlawful employment practice which does not need to be "'lodged with absolute formality, clarity, or precision.'" *Roces v. Reno Hous. Auth.*, 300 F. Supp. 3d 1172, 1205 (D. Nev. 2018) (citation omitted). The protest "must at least comprehensibly communicate that the opposed conduct 'fairly fall[s] within the protection' of the law." *Id*. (citation omitted).

Here, too, Plaintiffs have sufficiently established a meritorious claim that IPI retaliated against Plaintiffs. Because IPI was consistently failing to pay Plaintiffs their wages or consistently paying them well past pay day, Plaintiffs halted all work in an act of protest. With what seems to have been an immediate reaction, IPI severed all drinking water and internet services to the barracks Plaintiffs were housed in. Plaintiffs' original protest is protected conduct against IPI's illegal employment practices. (Compl. 10 ¶ 59.) Even more egregious is IPI's baseless suspension of the three leaders of the workers (Genç, Gökçe, and Karakaya), who are also credited as leading

the protest. (*Id*. at ¶ 66.) The sudden lifting of their suspension lends credence to Plaintiffs'

assertion that IPI was engaged in unlawful retaliatory conduct. Plaintiffs engaged in protected

activity and IPI took adverse action: these two events clearly have a strong causal link between

each other and no other reason has been proffered to explain IPI's culpable behavior.

Both claims of FLSA violations are meritorious and sufficiently pled in the Complaint.

Thus, the Court finds that these two *Eitel* factors strongly weigh in favor of default judgment.

3.   Amount at Stake

The sum of money at stake must be balanced against the seriousness of the offense. *Const.*

*Laborers Tr. Funds for S. Cal. Admin. Co. v. Anzalone Masonry Inc., et al*., 316 F. Supp. 3d 1192,

1201 (C.D. Cal. 2018). "The amount at stake must not be disproportionate to the harm alleged."

*Id*. If the sum of money requested is too large or unreasonable, default judgment is disfavored. *Id*.

(citation omitted). Nevertheless, a "substantial sum" may be reasonable depending on the

particular facts of the case. *Compare Eitel*, 782 F.2d at 1472 (approving denial of default judgment

where plaintiff "was seeking almost $3 million in damages from [defendant] and because the

parties disputed material facts in the pleadings"), *with United States v. Maxwell*, 2020 WL

2319978, at *2 (D. Ariz. May 11, 2020) (mitigating circumstances include the fact that the

"substantial" sum at stake of approximately $500,000 was "amassed over the course of [a] decade"

by individual who did not pay their tax obligation or remit payroll taxes for their businesses) *and*

*Granite State Ins. Co. v. CME Pro. Serv. LLC*, 2019 WL 399923, at *3 (D. Ariz. Jan. 31, 2019)

(determining amount at stake is substantial but weighing in favor of default judgment where

"Defendant would be unjustly enriched absent payment").

The Court evaluates the amount at stake for the Plaintiffs' claim of unpaid wages separately from the amount at stake for Plaintiffs' claim of retaliation.

>    i.   *Unpaid Wages*

At the time the lawsuit was filed on November 20, 2020, IPI had not paid any of Plaintiffs' wages since October 1, 2020, which amounted to three pay periods. (Compl. 10 ¶ 69, ECF No. 1.) Thirteen additional Plaintiffs still had unpaid wages prior to October—some from June 2020 and others from September 2020.  (*Id*. at 11 ¶ 75.) Class member Fuat Mert Öztuna is the only Plaintiff that had only one unpaid wages pending (Pay Period 18) at the initiation of the lawsuit, but had nine prior delayed pay checks. (ECF No. 31-1 at 8.)

However, by the time Plaintiffs submitted their Second Amended Statement of Damages on FLSA Claims on March 4, 2021, IPI had paid most of the unpaid wages pursuant to a separate lawsuit involving the Secretary of the U.S. Department of Labor. *See* Order Finding Civil Contempt and Imposing a Stop Work Order, *Acosta v. IPI et al*., No. 1:19-cv-00007 (D. N. Mar. I. Jan. 21, 2021), ECF No. 19 (mandating IPI immediately pay $788,022.54 in recent unpaid wages). Nevertheless, the amount at stake for remaining unpaid wages—$24,997.53—is not an unreasonable sum.

Plaintiffs also seek their statutory entitlement to liquidated damages based on IPI's untimely payments since June 2020. Although much of Plaintiffs' owed wages have reduced over time, Plaintiffs may still be legally entitled to liquidated damages in the amount of all untimely paid minimum and overtime wages, which totals $287,291.38. 29 U.S.C. § 216(b); *see also Caldman v. State of California*, 852 F. Supp. 898, 901 (E.D. Cal. 1994) (determining that

liquidated damages are discretionary).

The Court finds the amount of $312,288.91 for unpaid wages, unpaid overtime, and liquidated damages for all 29 members of the FLSA collective action legally consistent with the FLSA, and therefore reasonable and proportionate to the harm caused by IPI. Because the Court is awarding liquidated damages, no prejudgment interest will be awarded. *See Caldman*, 852 F. Supp. at 901 (awarding prejudgment interest if liquidated damages are inappropriate).

      *ii.*    *Retaliation*

Next, the Court evaluates Plaintiffs' second FLSA claim of retaliation with an amount requested of $937,181.51. As discussed *infra*, the Court limits punitive damages to IPI's retaliatory conduct, rather than the entirety of IPI's culpable conduct during Plaintiffs' employment. Plaintiffs' retaliation claim (and consequently the proposed punitive damages award) is based on three weeks of severed internet, food and water services for Plaintiffs' protests as well as the three days in which Genç, Gökçe, and Karakaya were prohibited from working. Although IPI retaliated against all 29 Plaintiffs for walking off the job on September 11, 2020, the Court finds that the amount at stake of $937,181.51—three times the entitlement for all of Plaintiffs' unpaid wages and liquidated damages for the months of delayed payment—is disproportionate to the specific harm alleged. Distributing the total punitive damages requested equally among Plaintiffs, the total amount would be approximately $32,3160.60 each. Awarding over $30,000 each for the three weeks of retaliatory behavior—where Plaintiffs have not demonstrated any other retaliatory conduct on the part of IPI—is an unreasonable amount. The Court disregards the subsequent General Release from its retaliation calculation because Plaintiffs have not in fact been injured by

them due to the Court's order declaring them unenforceable. Consequently, the Court awards Plaintiffs a smaller portion of the requested damages to a total of $165,647.00 for their FLSA retaliation claim, as explained below. The Court finds that this is a reasonable amount given the total compensatory and liquidated damages at stake and relative to IPI's conduct, thus weighing in favor of default judgment.

4. Material Dispute, Excusable Neglect, and Policy

The failure of a defendant to appear, and consequently the subsequent entry of default, suggests there is no genuine issue of material fact. *See Elektra Ent. Grp. Inc. v. Crawford*, 226 F.R.D. 388, 393 (C.D. Cal. 2005). The same is true for excusable neglect. *Laser Spine Inst., LLC v. Playa Advance Surgical Inst., LLC*, 2020 WL 5658711, at *4 (C.D. Cal. Sept. 23, 2020) ("There is no possibility of excusable neglect, as Defendants have openly flouted Court orders and refused to participate in this litigation . . . ."). However, the seventh factor generally weighs against default judgment, given that cases "should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. Nevertheless, this preference is not dispositive as "the default mechanism is necessary to deal with wholly unresponsive parties who otherwise could cause the justice system to grind to a halt." *Evans*, 2021 WL 75826, at *3 (internal quotation marks and citation omitted). "Defendants who appear to be 'blowing off' the complaint should expect neither sympathy nor leniency from the court." *Id*. (citation omitted). These factors are thus often easily addressed where defendants have failed to appear. *Id*. at *2.

Without any answer from IPI, the Court cannot conceive of any material dispute or

excusable neglect. This is especially true considering the wide publicity of this case.[13] While there is a "strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits," *Eitel*, 782 F.2d at 1472, there can be no decision on the merits where no defendant has made an appearance. IPI has manifested itself as a "wholly unresponsive party" who "appear[s] to be 'blowing off'" Plaintiffs' causes of action. There is nothing to suggest a finding otherwise. Thus, the remaining *Eitel* factors are met, and all seven *Eitel* factors weigh significantly in favor of granting Plaintiffs' motion.

## B. Damages

Plaintiffs argue they are entitled to unpaid wages and liquidated damages under the FLSA. They further maintain that the Court should award punitive damages based on the Seventh Circuit's *Travis* decision discussed below. Should the Court agree, Plaintiffs contend that their request of $937,181.51 in punitive damages for the 29 members of the FLSA collective action is reasonable.

A court may conduct a hearing to determine the amount of damages, establish the veracity

---

[13] *See* Kimberly B. Esmores, *IPI's H-2B workers seek court's default judgment*, SAIPAN TRIBUNE (Jan. 4, 2021), https://www.saipantribune.com/index.php/ipis-h-2b-workers-seek-courts-default-judgment/; Emmanuel T. Erediano, *Unpaid workers detail claims against IPI*, GUAM DAILY POST (Dec. 17, 2020), https://www.postguam.com/news/cnmi/unpaid-workers-detail-claims-against-ipi/article_aa215dfc-3e90-11eb-8f86-bf7da71e7cb5.html. "Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010). The Court therefore takes judicial notice of the publicity of this case.

In fact, the Court notified IPI at a hearing for *Acosta v. IPI et al.* regarding Plaintiffs' suit, but IPI did not indicate that they would make an appearance.

20

of allegations, or investigate other matters. Fed. R. Civ. P. 55(b)(2)(B)-(D). Importantly, allegations regarding damages are not taken as true and must be independently proven. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1997). Thus, "before the court can enter default judgment on a sum uncertain, the plaintiff must *prove* its damages." *Rubicon Global Ventures, Inc. v. Chongqing Zongshen Group Import/Export Corp.*, 226 F. Supp. 3d 1141, 1148 (D. Or. 2016) (emphasis in original) (citation omitted). However, the plaintiff "need not submit voluminous evidence to support a claim for damages; a declaration or affidavit . . . that support a damages award will suffice." *Barbee v. DNSPWR2 LLC*, 2020 WL 6585666, at *4 (D. Ariz. Nov. 10, 2020) (citing *Vogel*, 992 F. Supp. 2d at 1014). "[L]ess precise estimation[s] of damages" have been accepted "where a defendant frustrates the discovery of a precise amount by defaulting in the action. *Oakley, Inc. v. Moda Collection, LLC*, 2016 WL 7495837, at *1 (C.D. Cal. Sept. 28, 2016); *cf. Live Face on Web, LLC v. AZ Metroway, Inc.*, 2016 WL 4402796, at *6 (C.D. Cal. Aug. 15, 2016) (finding estimate of actual damages too speculative). Where a Plaintiff has "a valid methodology for making estimates, and so long as counsel explained the methodology in the motion for default judgment, an estimate might well be sufficient to convince the court to award damages." *Northwest Adm'rs, Inc. v. Uzunov Trucking, LLC*, 2010 WL 933873, at *2 (W.D. Wash. Mar. 11, 2010) (holding "nothing presumptively wrong" for estimated damages).

1. Unpaid Wages

Pursuant to the FLSA, employers may be liable to an employee for unpaid minimum wages and unpaid overtime. *See* 29 U.S.C. §§ 206 (minimum wage), 207 (overtime), 216(b) (penalties).

First, the FLSA guarantees only minimum wage payments for regular hours worked—no

more, no less. Thus, Plaintiffs may be entitled to unpaid minimum wages at a rate of $7.25 per hour for regular hours worked. Second, the FLSA also mandates overtime compensation by multiplying the employee's overtime hours by one and one-half times the regular rate of pay. *Id.* § 207(a)(1) (requiring employees working over 40 hours in a single work week to be paid "at a rate not less than one and one-half times the *regular rate* at which he is employed." (emphasis added)). The "regular rate," is distinct from the minimum wage and is defined as including "*all* remuneration for employment" paid to the employee. *Id.*   § 207(e) (emphasis added) (listing exhaustive list of exclusions such as gifts and vacation pay). Thus, overtime is the contractual rate of pay to which the employer and employee agreed.

Plaintiffs request a total of $24,997.53 in wages owed. (Second Am. FLSA Total Damages Spreadsheet, ECF No. 31-2.) The minimum wage rate is $7.25 per hour; the regular (contractual) rate for general construction workers is $8.35 per hour and for foremen $10.50 per hour. (Compl. 6.) Öztuna was paid a hourly contractual rate of $21.95 per hour. (Decl. Öztuna 2 ¶ 7, ECF No. 20.) The Court is required to multiply the minimum wage by unpaid regular hours and multiply one and one-half times the regular (contractual) rates by unpaid overtime hours. These totals are then subtracted by what Plaintiffs have already been paid. Because the Complaint, letters of commitment, and other supporting documents plainly indicate the rates and hours Plaintiffs are entitled to and what has already been paid, calculations are fairly straightforward.[14] (*See* Individual

---

[14] Plaintiffs were forthcoming in their briefing, acknowledging that "in some pay periods, workers received a paycheck for more than the hours they self-report they worked." (Statement of Damages 2-3, ECF No. 26.) They explained that this is partly due to discrepancies between Plaintiffs' records and IPI's timesheets, and partly due to payments made

Spreadsheets, ECF No. 31-1.) Considering the straightforward methodology, caselaw asserting that reasonable estimations are appropriate in light of an explained methodology, and IPI's failure to provide each worker a paycheck stub detailing the hours worked each pay period, unpaid wages in the amount of $24,997.53 is appropriate.

2.  Liquidated Damages

The FLSA plainly allows for liquidated damages in an amount equal to unpaid minimum wage and overtime wages. 29 U.S.C. § 216(b). However, "[t]he Portal-to-Portal Act, 29 U.S.C. § 260, made doubling discretionary rather than mandatory, by permitting a court to withhold liquidated damages in an action to recover unpaid minimum wages 'if the employer shows . . . that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA].'" *Caldman*, 852 F. Supp. at 901. The Ninth Circuit additionally holds that because the FLSA requires wages be timely paid, "wages become 'unpaid' . . . when they are not paid at the time work has been done"—both for minimum wage hours and overtime hours. *Biggs*, 1 F.3d at 1540.

Plaintiffs request a total of $287,291.38 in liquidated damages. (Second Am. FLSA Total Damages Spreadsheet, ECF No. 31-2.) To obtain this figure, Plaintiffs include the total minimum wages and the total overtime earned that were paid late since June, 2020. Because paychecks were consistently late beginning on June 19, 2020 (pay period 13) and onward for 28 Plaintiffs, the total

---

for overdue amounts in subsequent paychecks. (*Id*. at 3.) They conclude "the worksheets credit IPI for what appears to be overpayment in some pay periods and offsets those amounts from compensatory damages." (*Id*.) The Court is amenable to Plaintiffs' good faith efforts in providing as accurate an estimation for each individual member.

amounts owed are generally consistent among the 28 Plaintiffs, whether they are general construction workers or foremen. Öztuna is an exception insofar as his late payments were between May and September 2020. As he is the only exception, including Öztuna's calculations is not an onerous task. Thus, evaluating the total liquidated damages for all 29 members is straightforward, even with the slightly different figures for Öztuna and the five foremen. The Court adopts the representations as shown in the spreadsheets for each workers' total hours expended during each pay period commencing with 2020 pay period 13. (*Id*.) This total amounts to $287,291.38 in liquidated damages, and the Court finds no reason to deviate from this figure.

### 3. Punitive Damages

#### i.   *Availability of Punitive Damages for Retaliation*

As for the second cause of action, the FLSA penalizes unlawful retaliation by allowing for "legal or equitable relief as may be appropriate to effectuate the purposes of" the retaliatory provision at 29 U.S.C. § 215(a)(3), "*including without limitation* employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b) (emphasis added). To date, neither the Supreme Court nor the Ninth Circuit Court of Appeals have definitively addressed the availability of punitive damages for retaliatory conduct under the FLSA. *See Lambert v. Ackerley*, 180 F.3d 997, 1011 (9th Cir. 1999) (en banc), *cert. denied*, 120 S. Ct. 936 (2000) (describing the Seventh Circuit's analysis that punitive damages are available as "persuasive" but ultimately not deciding the issue). The two courts of appeals that have considered the question—the Seventh and Eleventh Circuits—are split. *See Snapp v. Unlimited Concepts, Inc*., 208 F.3d 928 (11th Cir. 2000) (punitive damages available); *Travis v.*

*Gary Cmty. Mental Health Center, Inc.*, 921 F.2d 108 (7th Cir. 1990) (punitive damages unavailable). District courts are similarly fractured, even within the Ninth Circuit. *Compare Clark v. Golden Specialty, Inc.*, 2017 WL 108465, at *2 (W.D. Wash. Jan. 11, 2017) (punitive damages available), *with Tumulty v. FedEx Ground Package Sys., Inc.*, 2005 WL 1979104, at *11 (W.D. Wash. Aug. 16, 2005) (punitive damages unavailable).

In *Snapp*, the plaintiff-employee sought, among other FLSA remedies, punitive damages for retaliatory discharge. *Snapp*, 208 F.3d at 930. The Eleventh Circuit, however, ultimately found in favor of the defendant-employer, reasoning that "[a]lthough it is clear that Congress did not limit a court in retaliation cases to the enumerated forms of relief, there is something that all of the relief provided in section 216(b) has in common: it is meant to *compensate* the plaintiff." 208 F.3d at 934 (emphasis in original). Because the enumerated remedies in the FLSA are "compensatory in nature," *Snapp* concluded that "[p]unitive damages . . . have nothing to do with compensation" and are therefore unavailable. *Id*. at 934.

By contrast, the Seventh Circuit in *Travis* held that punitive damages are available for retaliatory conduct under the FLSA. *Travis*, 921 F.2d at 112 . In that case, the plaintiff-employee asserted that the defendant-employer later retaliated against him when he invoked his FLSA rights. However, the *Travis* court reasoned that Congress' shift away from an express limitation in available damages to legal and equitable relief "without limitation" demonstrably enlarged an employee's available remedies. *Travis*, 922 F.2d at 111-12; *see Contreras v. Corinthian Vigor Ins. Brokerage, Inc*., 25 F. Supp. 2d 1053, 1059 (N.D. Cal. 1998) ("Congress' 1977 amendment to the FLSA 'appears to make clear that Congress meant to enlarge the remedies available for

[retaliation] beyond those standardly available for FLSA … violations.'" (quoting *Moskowitz v. Trustees of Purdue University*, 5 F.3d 279, 284 (7th Cir. 1993))). Therefore, the court concluded that legal relief as contemplated by the FLSA 1977 amendments and as "commonly understood" includes compensatory *and* punitive damages. *Travis*, 922 F.2d at 111. Furthermore, punitive relief "effectuate[s] the purposes" of the FLSA anti-retaliation provision by deterring "undesirable conduct by employers." *Marrow v. Allstate Sec. & Investigative Servs., Inc.*, 167 F. Supp. 2d 838, 843-44 (E.D. Pa. 2001). The FLSA is "meant to safeguard the overall operation of the FLSA by providing employees with protection substantial enough to discourage employers from engaging in retaliation." *Id*. at 844.

The Court agrees with the Seventh Circuit in *Travis* and finds that punitive damages are available for retaliatory conduct. Plainly read, the 1977 FLSA amendment expanded potential remedies by allowing for legal and equitable relief "*without limitation*." Such relief may include— *but is not limited to*—forms of compensatory relief. Furthermore, incentivizing large enterprises to avoid retaliatory action compels a reading more in line with *Travis*. It is entirely plausible that a plaintiff's total compensatory and liquidated damages be relatively nominal. For large enterprises that fail to conform to the mandates of the FLSA, nominal damages are but a drop in the bucket. That is, retaliatory conduct must be deterred—and awarding punitive damages are an effective tool for such deterrence. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582 (1996) ("[L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages.").

With this legal issued addressed, the Court now turns to its assessment of Plaintiffs' request for punitive damages.

ii.      *Amount of Punitive Damages Sought*

The U.S. Supreme Court articulated three "guideposts" in reviewing punitive damages: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

In assessing reprehensibility, the "most important" guidepost, courts must consider whether: (1) the harm was physical as opposed to economic, (2) there was clear indifference to the health or safety of others, (3) the target had financial vulnerability, (4) the conduct was repeated or isolated, and (5) the harm was the result of intentional malice or mere accident. *Id.* at 419; *see Gore*, 517 U.S. at 575 ("Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.").

The Court agrees with Plaintiffs' characterization of IPI's conduct as reprehensible. Although as far as the Court can tell, there was no physical harm inflicted on Plaintiffs, the other four factors in assessing reprehensibility weigh in Plaintiffs' favor. IPI cut off drinking water, food supply, and internet services for three weeks: "When we started to complain and protest against IPI and IDS, they first cut our shifts, then they didn't let us work our normal working hours . . . they cut internet, our food, bread and water, they did not make salary payments." (Decl. Tekten, ECF

No. 4-4 at 4.) Common sense dictates that a supply of food and clean drinking water is necessary for the health and safety of people. That IPI would eliminate access to such necessities day after day evinces a complete disregard for Plaintiffs' health and safety. Similarly, IPI's termination of internet services eliminated the most viable means for Plaintiffs to contact their families in Turkey, thereby demonstrating a total lack of empathy or consideration for their needs. These occurrences were not isolated incidents to a single plaintiff; IPI's conduct applied across the board and to the detriment of *all* Plaintiffs. As it relates to the three leaders, Genç, Gökçe, and Karakaya, IPI has not answered for its baseless three-day suspension of these individuals. The financial vulnerability of these Plaintiffs and isolation from their families in Turkey exacerbates the very unfortunate circumstances IPI put them in. Taking these representations from the Complaint as true, nothing suggests that IPI's conduct was reasonable or warranted but in fact, reprehensible.

Punitive damages must also bear a "reasonable relationship" to compensatory damages under the second guidepost. *Gore*, 517 U.S. at 580. Caselaw reveals that although there is no bright line ratio in determining punitive damages, "few awards exceeding a single-digit ratio of compensatory to punitive damages, to a significant degree, will satisfy due process." *Campbell*, 538 U.S. at 425. The U.S. Supreme Court in at least one decision suggested that punitive damages four times the amount of actual damages may be constitutional despite being close to excessive. *Pac. Mut. Life Ins., Co. v. Haslip*, 499 U.S. 1, 22 (1991). Where compensatory damages are substantial, "a lesser ratio" of punitive damages, "perhaps only equal to compensatory damages," would be appropriate. *Campbell*, 538 U.S. at 425. However, the U.S. Supreme Court has similarly maintained that where nominal amounts for compensatory damages are awarded, punitive

damages may be enlarged. *See Gore*, 517 U.S. at 582 ("[L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages."); *see also Greathouse v. JHS Sec. Inc.*, 2015 WL 7142850, at *7 (S.D.N.Y. Nov. 13, 2015) ("Because the FLSA does not specifically mention punitive awards, it obviously does not give a standard by which to judge their imposition. Courts have often relied on the standard articulated in 42 U.S.C. § 1981a(b)(1), which governs various federal employment discrimination statutes.") *report and recommendation adopted by Greathouse v. JHS Sec., Inc.*, 2016 WL 4523855 (S.D.N.Y. Aug. 29, 2016); *see, e.g., Bryant v. Jeffrey Sand Co*., 919 F.3d 520, 528 (8th Cir. 2019) (finding jury award of $250,000.00 in punitive damages in view of jury award of $1.00 in compensatory damages proportionate to defendant's reprehensible conduct in Section 1981 Civil Rights claim for racially hostile work environment and retaliatory termination); *Swinton v. Potomac Corp.*, 270 F.3d 794, 818-19 (9th Cir. 2001) (upholding $1 million award of punitive damages against a $35,612 award in compensatory damages in Section 1981 Civil Rights claim for racial harassment).

Plaintiffs' request for punitive damages is not proportionate to the reprehensibility of IPI's behavior and does not bear a reasonable relationship to the compensatory damages awarded. "Any employer who violates the [anti-retaliation] provisions of section 215(a)(3) . . . shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) . . . ." 29 U.S.C. § 216(b). Plainly put, punitive damages must be limited to incidents of retaliation. Plaintiffs request for $937,181.51 to penalize IPI includes the period for non-retaliatory conduct, i.e., failure to make timely payments which occurred before and after IPI retaliated against

Plaintiffs. However, punitive damages are only available in response to the retaliatory conduct—specifically, the severed internet, food, and water services, and additional punitive damages for the three leaders who were prohibited from working for three days. Thus, Plaintiffs current request for $937,181.51 in punitive damages—three times the amount of total compensatory and liquidated damages—is disproportionate to the harm inflicted during the three weeks of IPI's retaliatory conduct. Therefore, the Court will reduce this amount and base its calculation of punitive damages relative to the unpaid wages and liquidated damages during the shorter period and effects of retaliation.

To calculate the punitive damages warranted in this case, the court looks to a decision from the Southern District of New York as persuasive authority. In *Greathouse v. JHS Security Inc.*, 2015 WL 7142850, plaintiff requested from the defendant-employer over six months of backpay owed to plaintiff. The defendant-employer then requested plaintiff to meet at defendant-employer's house at which point plaintiff was threatened at gunpoint and told that he would be paid when defendant-employer felt like it. The plaintiff interpreted this threat as "effectively a termination." *Id*. at *2 (internal quotation marks omitted). The court had previously awarded plaintiff $33,235 for damages owed before termination (unpaid overtime, wages, unlawful deductions, and liquidated damages). Then, initiating a civil action based on retaliation, plaintiff sought $21,450 in back pay (essentially for unemployment), $20,000 in emotional distress damages, $214,500 in punitive damages, and equivalent liquidated damages for both the back pay and emotional distress. *Id*. at *3. To derive his figure for punitive damages on his retaliation claim, plaintiff used a "10x back pay multiplier" resulting in an award of $214,500. *Id*. at *7. In evaluating

how to award punitive damages, *Greathouse* noted: "The Second Circuit has cautioned that '[a]wards of punitive damages are by nature speculative, arbitrary approximations. No objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct. Nor is there any formula to determine the dollar amount needed to effectuate deterrence.'" *Id*. at *7 (quoting *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013)). Deciding that punitive damages were warranted in this case, the court considered the total compensatory damages for plaintiff's retaliation claim and compensatory damages for before he was terminated. Although the court found that an upper limit of $344,540 was possible, it ultimately awarded plaintiff $10,000 in punitive damages. The Court, here, finds the method of calculation in *Greathouse* helpful in its analysis of awarding punitive damages in the case at bar and now turns to its calculations.

First, as the Court has determined that punitive damages are appropriate for retaliation only, it must turn to the appropriate time frame when the retaliation occurred. As discussed previously, Plaintiffs' requested amount seeks to hold IPI accountable for the entirety of its violations of the FLSA, but employers are only liable "for such legal or equitable relief as may be appropriate to effectuate" the purposes of the FLSA's anti-retaliation provision. Given this purpose, the approximate periods in which internet, water and food services were cut off in response to all of the Plaintiffs' protected activity, the work stoppage and protest, lasted approximately one month—September 11 through October 4, 2020—and occurred within pay periods 20 and 21. The suspension of the three Turkish workers who were considered the "leaders" of the protest extended their period for another three days, which occurred at the beginning of pay period 22. Thus, the

Court looks to these pay periods to calculate an appropriate amount for punitive damages.

To consider the constitutionally permissible upper limit of punitive damages, the Court looks at the following:

> (1) Contractual wages owed to the three leaders and 25 members (not including Öztuna) during pay periods 20 and 21 as this is what the Plaintiffs would have been entitled to but for the work stoppage;

> (2) 40 hours of overtime to 28 members (not including Öztuna) based on the number of overtime hours from previous pay periods, notably pay period 19, and IPI's promise of 94 hours of overtime per month (Compl. 6 ¶ 26); and

> (3) Liquidated damages totaling 80 hours based on the minimum wage as a result of IPI's repeated failure to timely provide paychecks.[15]

The sum total of these figures is then factored against multipliers of three, two, and one for each of the three different groups of Plaintiffs. The three different groups each reflect punitive damages based on the egregiousness of IPI's retaliatory conduct and the impact on each Plaintiff, starting with the three suspended Plaintiffs for being considered leaders (factor of three), then the twenty-five workers who suffered an extended period of delayed paychecks (factor of two), and finally Mr. Öztuna (factor of one). In making its assessment of IPI's egregious conduct, the Court acknowledges the representations in the Complaint. On October 1, 2020, IPI paid seventeen of the

---

[15] The Court derives these numbers from the documents provided by Plaintiffs; in particular, the Court uses the individual spreadsheets that identify the individual members and the amount owed for each pay period. (*See* ECF No. 31-1.)

Turkish workers for Pay Period 20, and twenty-six workers for Pay Period 13. (Compl. 10 ¶ 64.) However, eleven workers still had not received their paycheck for Pay Period No. 20, and two workers remain unpaid for No. 13. (*Id.*)[16] After the October 1st payment, none of the Plaintiffs (other than Mr. Öztuna) received their pay for three subsequent pay periods, and this lawsuit followed. (*Id.* ¶¶ 69, 74.) Thus, while the Court confines its calculations to pay periods 20 and 21, it does take into consideration the fact that Plaintiffs protested in response to IPI's failure to compensate them for work performed since June 2020 (pay period 13). The table below reflects what the Court finds to be a reasonable upward limit of $184,057.20 based on the applicable compensatory and liquidated damages.

| Members | Total unpaid contractual wages (PP 20 and 21) | Overtime hours (40 hours) | Total liquidated damages (PP 20 and 21 equivalent minimum wages) | Total unpaid contractual wages, overtime (40 hrs), and liquidated damages (equivalent minimum wages) | Multiplier | Upper Limits |
|---|---|---|---|---|---|---|
| Suspended Leaders (Gökçe, Karakaya, Genç) | $4,696.00 | $1,760.80 | $3,480.00 | $9,936.80 | 3 | $29,810.40 |
| 25 Members | $34,432.00 | $29,000.00 | $12,907.60 | $76,339.60 | 2 | $152,679.20 |
| Fuet Mert Öztuna | - | - | $1,567.60 | $1,567.60 | 1 | $1,567.60 |
| **TOTALS** | **$39,128.00** | **$30,760.80** | **$17,955.20** | **$87,844.00** | | **$184,057.20** |

[16] The Complaint later states the inverse: that two workers had yet to be compensated for Pay Period No. 20, and eleven workers had not been compensated for Pay Period No. 13. (Complaint 11 ¶ 75.) Either way, IPI still had not paid all the Plaintiffs for Pay Period No. 20.

Based on the upper limit figure above, the Court will award $165,647.00 in punitive damages as follows. For the three leaders of the work stoppage who suffered an additional sanction of suspension on top of the same injury suffered by all the other workers of severed internet, deprivation of food and water services, and denial of multiple paychecks, the Court will award a total of $26,400.00 to be distributed evenly. This results in an award of $8,800.00 each to Özcan Genç, Hasan Gökçe, and Mehmet Karakaya. For the 25 members who suffered severed internet, deprivation of food and water services, and the denial of their multiple paychecks as a result of their protest for unpaid wages dating back to June 2020, the Court will award a total of $137,500.00 to be distributed evenly. This results in an award of $5,500.00 for each of the 25 members. And finally, Mr Öztuna will be awarded a total of $1,747.00 for having suffered the same experiences as the others while waiting for the one late payment.[17]

Finally, the third guidepost requires comparing the punitive award to penalties authorized for similar misconduct. In the CNMI, an employee who has been retaliated against may seek reimbursement for lost wages and work benefits caused by the employer. 4 CMC §§ 9083, 9084 (large employers). The Plaintiffs have not brought forth nor is the Court aware of any local or

---

[17] The Court notes that Öztuna quit his employment with IPI on September 4, 2020—days before the protest occurred. Nevertheless, he was entitled to his pay on September 11, 2020, but did not receive it on that day and is therefore properly a part of the IPI protesters. Although it is unclear when he took on new employment in Guam subsequent to his resignation, he does claim to have experienced retaliation by IPI. (Decl. Öztuna 2, 3, ECF No. 20 ("When I and other Turkish workers complained, they retaliated by stopping to provide Turkish meals, drinking water, and internet service."). Öztuna did not receive his final pay even after the other workers returned to work; IPI still owed him that final paycheck at the time this lawsuit was filed.

federal caselaw on punitive damages in this regard, so this guidepost does not aid in the analysis of the constitutionality of the punitive-damages award.

**V.     CONCLUSION**

By filing this action to pursue their legal remedy while still under the care and employment of their employer, Plaintiffs took a rare bold step as employees against their employer. Plaintiffs relied on IPI for their food, lodging, and a return ticket home. After IPI's continuous failure to compensate Plaintiffs, Plaintiffs pursued their legal rights in court.

For the reasons stated, the Court GRANTS Plaintiffs' Motion for Partial Default Judgment (ECF No. 16) pursuant to Federal Rule of Civil Procedure 55(b), the *Eitel* factors, and the Fair Labor Standards Act, *see* 29 U.S.C. § 216(b). The Court grants partial default judgment in favor of Plaintiffs and against Defendant IPI for the first cause of action for FLSA unpaid minimum wage and overtime pay. Plaintiffs are awarded unpaid wages and overtime in the amount of **$24,997.53**, plus liquidated damages in the amount of **$287,291.38**. For the second cause of action regarding the FLSA anti-retaliation provision, Plaintiffs are awarded punitive damages in the amount of **$165,647.00**. The total amount in damages for these two causes of action is **$477,935.91.**

IT IS SO ORDERED this 24th day of February, 2022.

RAMONA V. MANGLONA
Chief Judge